**FILED**

JAN − 2 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HORACE E. ASHLEY, JR., | No. C 13-00918 BLF (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| DOLLY MATTEUCCI, Interim Director, | |
| Respondent. | |

    Petitioner, proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  The Court ordered Respondent to show cause why the amended petition should not be granted.  Respondent has filed an answer addressing the merits of the petition.  Petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

///

///

///

---

[1]This matter was reassigned to this Court on April 17, 2014.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\BLF\HC.13\00718Ashley_denyHC.wpd

# BACKGROUND

The following facts are taken from the California Court of Appeal opinion.[2]

## I. Background

On February 17, 1982, defendant assaulted the victim Carlos Corona with an axe.

On August 4, 1982, defendant pleaded guilty to one count of assault with a deadly weapon (§ 245, subd. (a))[3] and admitted to a use clause and a great bodily injury clause. The trial court concluded he was insane at the time of the commission of the offense and found him not guilty by reason of insanity (NGI). (§ 1026.)

On August 25, 1982, defendant was committed to Atascadero State Hospital for a maximum term of seven years. (§ 1026.5, subd. (a)(1).) He was subsequently transferred to Napa State Hospital (NSH).

On November 27, 1984, a jury found defendant was not restored to sanity in that he remained a danger to the health and safety of others. (§ 1026.2.)

On August 19, 1991, the People filed a petition and affidavit for commitment beyond the prescribed term. [FN2] (§1026.5)

FN2. The record in this case is somewhat incomplete. Evidently, the August 19, 1991 petition was granted.

In 1994, defendant was released on a Conditional Release Program (CONREP) for about seven months. He started experiencing the same symptoms that had appeared at the time of his underlying offense. His CONREP status was revoked in 1995.

In February 18, 2010, defendant's commitment was extended for two years, until March 1, 2012, (§1026.5, subd. (b)(8).) The trial court found defendant continued to suffer from paranoid schizophrenia and posed a substantial danger of physical harm to others.

On October 6, 2011, the People moved for another two-year extension of commitment pursuant to section 1026.5, requesting an extension until March 1, 2014.

## II. The Trial

On January 24, 2012, a contested hearing was held on the People's recommitment request.

---

[2]*People v. Ashley*, No. A134482 (Cal. App. 1 Dist. Nov. 14, 2012). (Ans. Ex. A ("Op").)

[3]All further statutory references are to the Penal Code unless otherwise stated.

1

### A. Dr. Todd Schirmer

2

3

4

Dr. Todd Schirmer, a psychologist at NSH, testified on behalf of the people. He works in a long-term unit comprised mainly of NGI patients. As part of his duties, he prepares progress reports for the courts pertaining to whether individuals should remain at the hospital for continuing treatment. The trial court allowed him to testify as an expert in the area of psychology.

5

6

7

8

9

10

Schirmer had been a part of defendant's treatment team for about six months prior to trial. Treatment teams at NSH include a psychologist, a psychiatrist, a social worker, and a rehabilitation therapist. The team meets monthly to document each committee's progress. In July 2011, Schirmer co-authored a six-page report for the trial court regarding whether defendant should be recommitted. The other co-author was the treatment team's psychiatrist. In preparing the report, Schirmer reviewed three volumes of material on defendant, including his chart, nursing notes, physician's notes, and his legal record.

11

12

13

14

15

16

17

Defendant's primary diagnosis is schizophrenia paranoid type. He has a history of very prominent delusions of being persecuted by the government, and of believing that his food and medications are poisoned. When interacting with Schirmer, defendant tends to be guarded. He is very friendly, but typically does not share much about what he is thinking. He usually asks for his medications to be lowered and reports a variety of side effects from them. He has written letters to various officials, including former Vice President Dick Cheney and former Governor Arnold Schwarzenegger. During one conference with Schirmer, he demanded the contact information for a local politician and became so angry that he had to be asked to leave. On one occasion, he wrote a letter to the executive director of the hospital asking for more time out on the grounds to exercise because he believed he was going to be called for a special forces mission.

18

19

20

21

22

23

24

Based on reports of the underlying offense, Schirmer believed defendant was in a paranoid state at the time of the incident. Defendant reportedly stated that Coronoa had grabbed at his (Corona's) crotch, a gesture that implied he thought defendant was homosexual. This angered defendant so he hit him in the head with an axe, severing a number of fingers and causing damage to his head. When defendant committed the offense, he had not slept for five days. Sleeplessness can be a symptom of schizophrenia. Around that time, defendant also believed others wanted him to run for some sort of office so that he could then be assassinated. In the past two years, defendant has had some delusions regarding President Obama. He currently is prescribed three milligrams twice a day of Risperidone for his schizophrenia.

25

26

27

28

Schirmer noted defendant does not agree with his psychiatric diagnosis. He also does not think he needs to take medications for his schizophrenia. He admits he may have some emotional problems, but denies having a mental illness. He thinks he could benefit from one-to-one therapy. Although he does not believe he needs medications, he currently does take them. However, in May 2010, he refused to take his medications for about two to three months. During this time he became more delusional and his sleep was impaired. He wrote a lot of letters and

had difficulty eating because he believed the food was poisoned. He eventually was compelled by staff to resume taking his medications.

Schirmer opined defendant would not take his medications if released to the community. He believes he can cure himself without medications. Defendant lacks insight regarding his symptoms and his condition. This lack of insight shows that he would be likely to stop taking his medications as he does not believe he has an illness that requires them. Defendant has made no progress towards understanding his illness. He has mentioned he is aware that sleeplessness is a warning sign that he may be deteriorating, and that perceiving injustice in the world is a trigger for him. Schirmer opined defendant would pose a substantial risk of danger to others if he was not in a hospital setting. In particular, without medications he becomes more symptomatic and more delusional, which in the past has led to violence.

When defendant was in CONREP in 1994, he started having many of the same symptoms that he experienced around the time he committed his offense. Seven months later he was sent back to NSH after he wrote a letter to the FBI in which he threatened to assault or kill someone within the next two or three months. He wrote the letter hoping the FBI would stop people from tormenting him by smacking their lips or chewing gum. He believed this behavior was a personal attack on him which might require him to assault or kill the perpetrators. During the past two years, defendant has had no documented behavioral problems. There are no reports of verbal or physical aggression, or of any dangerous or criminal behavior. He is able to take care of all his activities of daily living, such as bathing and washing his own clothes. He has been compliant with his medications, apart from the three months in 2010 when he refused to take his Risperidone.

**B. Defendant**

The prosecutor called defendant to testify. His attorney objected to his being called as a witness, citing to section 1026.5, subdivisions (b)(7), which provides, in pertinent part, "The person [for whom extension of recommitment is sought] shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees." Reasoning that Fifth Amendment privileges do not apply in the context of NGI recommitment proceedings, the trial court overruled the objection.

Defendant testified that his original offense was hitting a man on the side of the head with a hatchet. He said he did it because he became angry when the man came from behind a hotel counter and rubbed his crotch at him, which he perceived as a homosexual advance. Defendant worked as a cab driver and his relief driver had just made the same gesture when he dropped defendant off at the hotel, which had also angered him. He hit the victim in the head with the hatchet as they were going up in an elevator. He carried the hatchet to make people afraid to do this kind of thing to him. A lot of men had rubbed their crotches at him in Seattle in 1981. He believed they did this in response to his self-imposed celibacy. He regretted hitting Corona because he believed Corona tried to protect him during the criminal proceeding by lying and

saying that defendant had not hit him with the axe. He also regretted it because he felt that hitting Corona in the head was an overreaction in comparison to what he had done to defendant.

Defendant testified that he believes he has a "criminal mind" but does not think he is psychotic. He thinks "psychotic" refers to people who experienced great trauma during birth. He stated that he would prefer to take a different kind of medication than Risperidone. He thinks he can benefit from medications, but does not believe they are essential to keep him from becoming psychotic or committing crimes. If he were to be released he would take his required medications, though he would pursue legal action to try to get off them. He has always taken his medications except for a period when a psychiatrist named Dr. Glasser started working with him. At that point defendant began experiencing physical symptoms and he thought the doctor was trying to damage his liver by tampering with his medication. He also thought the doctor was putting a paranoia-inducing chemical in his food.

Defendant recognized that he has had some symptoms, such as sleeplessness. If he experienced symptoms while outside of the hospital he might mention it in a group setting, but he did not believe it would ever get as bad as before. When he was in CONREP in 1994 he did write a letter to the FBI saying that he was being harassed by people chewing gum and smacking their mouths. In the letter, he indicated he would either defect to a more friendly country, or would assault or kill someone within two or three months. He thought by writing the letter he would get attention and the word would get around for people to "get off my back." He was angry because he could not find a job, and he was bothered by people chewing gum and smacking their lips on the bus. He had hoped the FBI would do something about it.

### C. The Trial Court's Finding

At the conclusion of the bench trial, the trial court found defendant to be a substantial danger to himself and to others, and granted the two-year extension on his commitment. This appeal followed.

(Op. at 1-6.)

On November 14, 2012, the California Court of Appeal affirmed the order extending Petitioner's commitment. (Ans. Ex. A.)

On January 23, 2013, the California Supreme Court denied review. (*Id.*, Ex. B.)

On February 28, 2013, Petitioner filed the instant action. Thereafter, he filed first and second amended petitions. The Court issued an order to show cause based on the second amended petition on June 5, 2013.

///

///

1                                    **DISCUSSION**

2    A.    <u>**Standard of Review**</u>

3            This Court may entertain a petition for writ of habeas corpus "in behalf of a person

4    in custody pursuant to the judgment of a state court only on the ground that he is in

5    custody in violation of the Constitution or laws or treaties of the United States." 28

6    U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996

7    ("AEDPA"), a district court may not grant a petition challenging a state conviction or

8    sentence on the basis of a claim that was reviewed on the merits in state court unless the

9    state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or

10   involved an unreasonable application of, clearly established federal law, as determined by

11   the Supreme Court The first prong applies both to questions of law and to mixed

12   questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the

13   second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,

14   537 U.S. 322, 340 (2003).

15           "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

16   state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

17   question of law or if the state court decides a case differently than [the] Court has on a set

18   of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court

19   decision is an "unreasonable application of" Supreme Court authority, falling under the

20   second clause of § 2254(d)(1), if the state court correctly identifies the governing legal

21   principle from the Supreme Court's decisions but "unreasonably applies that principle to

22   the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not

23   issue the writ "simply because that court concludes in its independent judgment that the

24   relevant state-court decision applied clearly established federal law erroneously or

25   incorrectly." *Id.* at 411.

26           "Under the 'unreasonable application' clause, a federal habeas court may grant the

27   writ if the state court identifies the correct governing legal principle from [the Supreme

28   Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

1    case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application'

2    clause, . . . a federal habeas court may not issue the writ simply because that court

3    concludes in its independent judgment that the relevant state-court decision applied

4    clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas

5    court making the "unreasonable application" inquiry should ask whether the state court's

6    application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

7    The federal habeas court must presume correct any determination of a factual issue made

8    by a state court unless the petitioner rebuts the presumption of correctness by clear and

9    convincing evidence. 28 U.S.C. § 2254(e)(1).

10       The state court decision to which Section 2254(d) applies is the "last reasoned

11   decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991);

12   *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned

13   opinion from the highest state court considering a petitioner's claims, the court "looks

14   through" to the last reasoned opinion. *See Ylst*, 501 U.S. at 805. In this case, the last

15   reasoned opinion is that of the California Court of Appeal. (Ans. Ex. A.)

16       The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

17   there is a heightened level of deference a federal habeas court must give to state court

18   decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v.*

19   *Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per

20   curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a

21   highly deferential standard for evaluating state-court rulings' and 'demands that

22   state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted).

23   With these principles in mind regarding the standard and limited scope of review in which

24   this Court may engage in federal habeas proceedings, the Court addresses Petitioner's

25   claims.

26   B.    **Legal Claims and Analysis**

27       Petitioner raises three claims as grounds for federal habeas relief: (1) he was

28   denied his right to a jury trial when his counsel waived a jury trial against his wishes; (2)

1  the trial court violated Petitioner's right against self-incrimination by forcing him to

2  testify; and (3) the trial court violated his due process rights by failing to abide by state

3  statutory procedures.

4       The state appellate court outlined the statutory framework for NGI commitments

5  as follows:

6       A defendant found NGI may be committed to a state hospital or
        other treatment facility, unless sanity has been fully restored. (§ 1026.) If
7       the court orders such a commitment, it is required to set a maximum term
        (§1026, subd. (e)(2)), defined as the longest prison term that could have
8       been imposed on the defendant. (§1026.5, subd. (a)(1)). Thereafter, a
        commitment may be extended only in felony cases and only when a
9       defendant "represents a danger of physical harm to others" due to "a mental
        disease, defect, or disorder." (§ 1026.5, subd. (b)(1).)
10

11      At least 180 days before the end of the commitment term, the
        hospital's medical director must provide the district attorney with an
12      opinion as to whether a defendant's commitment should be extended. (§
        1026.5, subd. (b)(2).) The prosecution may then file for an extension of
13      commitment. (*Ibid.*) Unless good cause is shown, a trial on the petition
        shall begin at least 30 days before the existing commitment is due to end.
14      (§ 1026.5, subd. (b)(4).) In commitment proceedings, "The individual is
        entitled to appointment of counsel and a jury trial, the issue raises a
15      question of fact, and the state has the burden of proving beyond a
        reasonable doubt the person is mentally ill and a physical danger to others."
16      (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1434 (*Dobson*).) If the
        defendant is proven to currently represent a substantial danger as described
17      in the statute, the trial court must order recommitment for an additional two
        years. (§ 1026.5, subd. (b)(8).) He or she "may not be kept in actual
18      custody longer than two years unless another extension of commitment is
        obtained...." (*Ibid.*) Subsequent proceedings must be conducted in the
19      same manner as the original extended commitment proceeding. (§ 1026.5,
        subd. (b)(10).)

20      NGI recommitment trials are not considered criminal proceedings:
        "The proceedings to extend commitments under section 1026.5 are
21      essentially civil in nature, for which the purpose is treatment and not
        punishment, even though they include many constitutional protections
22      relating to criminal proceedings. [Citations.] 'An individual subject to
        recommitment proceedings "is not threatened with penal treatment. He has
23      had his criminal trial and been adjudicated not guilty by reason of insanity.
        The only remaining issue is how long he must remain committed to a state
24      hospital for treatment." [Citation.] No criminal adjudication is involved.'
        [Citations.]" (*Dobson, supra,* 161 Cal.App.4th 1422, 1435.)
25

26  (Op. at 6-7.)

27  ///

28  ///

1           1.    **Right to a Jury Trial**

2           Petitioner's first claim is that the trial court erred by accepting counsel's jury trial

3   waiver over Petitioner's express objections.  Respondent asserts that Petitioner fails to

4   show that he has a cognizable federal claim for procedural deficiencies at his state

5   recommitment hearing.  (Ans. at 5.)

6           Commitment to a mental hospital produces a massive curtailment of liberty and

7   consequently requires due process protection.  *See Vitek v. Jones*, 445 U.S. 480, 491-92

8   (1980).  This is true even where the respondent is already a prisoner in custody of the

9   state or federal government.  *See id.* at 493-94.  However, because a commitment hearing

10  is a civil matter, the constitutional rights to which a defendant in a criminal trial is entitled

11  do not adhere to a respondent in a commitment hearing.  *See United States v. Budell*, 187

12  F.3d 1137, 1141 (9th Cir. 1999).  Nonetheless, the Supreme Court has held that

13  procedural due process guarantees certain protections to civil commitment respondents.

14  *See Vitek*, 445 U.S. at 491-94.  In *Vitek*, the Court identified the following as minimum

15  safeguards to which due process entitled a respondent in a commitment proceeding:

16  written notice; a hearing at which the evidence being relied upon for the commitment is

17  disclosed; an opportunity at the hearing for the respondent to be heard in person, to

18  present testimony and documentary evidence, and to cross-examine witnesses called by

19  the state; an independent decision-maker; a reasoned, written decision; the availability of

20  an independent advisor, not necessarily an attorney; and effective and timely notice of all

21  these rights.  *See id.* at 494-96; *Carty v. Nelson*, 426 F.3d 1064, 1074 (9th Cir.), *amended*,

22  431 F.3d 1185 (9th Cir. 2005).

23          The California Court of Appeal rejected Petitioner's claim that his right to a jury

24  trial was personal, finding that the right was statutory for commitment proceedings and

25  therefore could be waived by counsel over a defendant's objections:

26              Just prior to trial, defendant personally requested a trial by jury but
            his counsel waived a jury over his objection. The trial court began by
27          stating: "This was sent here for a court trial. I'm not sure if the record
            reflects whether or not a jury waiver has been entered on behalf of
28          [defendant[. George [referring to defendant's counsel] is it the intention of

your client to waive jury and proceed by way of court trial?" Counsel responded in the affirmative. Initially, defendant did not appear to know that he had a right to a jury trial: "I want to have a jury trial. I asked you [referring to his attorney], did I have a choice, and you said 'no.' I didn't know I had a choice for this. You told me I didn't have a choice." After considering *People v. Powell* (2004) 114 Cal.App.4th 1153 (*Powell*) and *People v. Givan* (2007) 156 Cal.App.4th 405 (*Givan*), the court accepted a jury waiver from defendant's counsel.

### A. No Violation of Defendant's Statutory Rights

As noted above, [Cal. Penal Code] section 1026.5, subdivision (b)(7), provides that an individual facing commitment beyond a maximum statutory term "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." This subdivision further provides that "All proceedings shall be in accordance with applicable constitutional guarantees." (*Ibid.*) Additionally, the trial court must "advise the person named in the petition of the right to be represented by an attorney and of the right to a jury trial." (§ 1026.5, subd. (b)(3).) Thereafter, the court is required to conduct a trial on the petition, which must "be by jury unless waived by both the person and the prosecuting attorney." (§ 1026.5, subd. (b)(4).) On appeal, defendant contends his extended-commitment order must be set aside because the trial court initially failed to advise him of his right to a jury and failed to obtain his personal waiver even after he demanded a jury trial. He asserts that because a personal waiver of the right to a jury is required in a criminal proceeding, the court was statutorily required to obtain his personal waiver in this commitment proceeding. Relevant appellate opinions suggest otherwise.

In the present case, the record does not reflect that the trial court expressly advised defendant of his right to a jury trial. However, he did become aware that he had such a right prior to the trial and he expressly refused to waive it. Thus, any error in failing to formally advise him of this right to a jury per section 1026.5, subdivision (b)(3), may be deemed harmless as the issue was placed squarely before the court. The only issue is whether the court erred in accepting the waiver from his counsel over his objection. On this point, it is established that, in civil commitment proceedings generally, a committee's personal waiver of a jury is not required or necessary and counsel may waive a jury on the individual's behalf. Moreover, at least one appellate court has specifically held that counsel may waive a jury trial in NGI extension trials even over the defendant's objection. (See [*People v.*] *Powell* [(2004)] 114 Cal.App.4th 1153.)

Defendant claims article I, section 16 of the California Constitution [FN3] applies per Penal Code section 1026.5, subdivision (b)(7), by virtue of the subdivision's language stating that a committee "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." "The goal of statutory construction is to ascertain and effectuate the Legislature's intent. Generally, the words of the statute provide the most reliable indication of legislative intent. [Citation.] If the words are clear and unambiguous, the Legislature is presumed to have meant what it said and no statutory construction is needed. We follow the Legislature's intent and the plain words of its statutes regardless of what we think of the wisdom, expediency, or policy of the enactment. [Citation.] We

do not follow the plain meaning rule only if to do so would frustrate the purpose of the statute or lead to an absurd result." (*People v. Haynie* (2004) 116 Cal.App.4th 1224, 1228 (*Haynie*).)

> FN3. The California Constitution provides, in relevant part: "A jury may be waived in a criminal cause by the consent of both parties expressed in open court *by the defendant* and the defendant's counsel." (Cal. Const., art. I, § 16, italics added.)

In *People v. Otis* (1999) 70 Cal.App.4th 1174 (*Ohio*), the appellate court addressed whether counsel could waive the right to a jury for a defendant challenging a determination by the Board of Prison Terms that he qualified as a mentally disordered offender (MDO). Section 2972, like section 1026.5, subdivision (b)(4), requires that the court advise the defendant of the right to a jury and also states that the trial "shall be by jury unless waived by both the person and the district attorney." (§ 2972, subd. (a).) The *Otis* court concluded the statute did not require a defendant's person waiver: "Section 2966 [giving MDO defendants the right to trial] concerns persons who have been found by the Board of Prison Terms to be mentally disordered. The Legislature must have contemplated that many persons, such as [the defendant], might not be sufficiently competent to determine their own best interests. There is no reason to believe the Legislature intended to leave the decision on whether trial should be before the court or a jury in the hands of such a person." (*Otis, supra,* at p. 1177.) Importantly, the court opined that "had the Legislature intended that waiver could only be made personally by the petitioner, the Legislature would have made its intent clear." (*Id.* at p. 1176; accord, *People v. Montoya* (2001) 86 Cal.App.4th 825, 829; cf. *In re Conservatorship of John L.* (2010) 48 Cal.4th 131, 148 [absent statutory prohibition, counsel may waive proposed mentally ill conservatee's right to jury]; *People v. Masterson* (1994) 8 Cal.4th 965, 972 (*Masterson*) [counsel may waive the right to a jury trial in a competency proceeding]; *People v. Rowell* (2005) 133 Cal.App.4th 447, 454 [no requirement of personal waiver of jury in sexually violent predator (SVP) proceeding]; cf. *People v. Hinton* (2006) 37 Cal.4th 839, 874-875 [trial court not required to secure defendant's express, personal waiver of statutory right to a separate proceeding on the prior-murder-conviction special-circumstance allegation].

In *Powell,* the appellate court relied on *Otis,* in finding that section 1026.5 does not mandate the same personal waiver of jury trial that is constitutionally required in criminal cases. The appellate court accordingly concluded counsel could waive the jury even over a defendant's objection. (*Powell, supra,* 114 Cal.App.4th 1153, 1156.) The court reasoned, "[a]n insane person who is 'a substantial danger of physical harm to others'" has no right to veto his or her attorney's waiver of the right to trial by jury in a civil extension hearing. (*Id.* at p. 1158.) The court observed an NGI extension trial, like an MDO proceeding, is civil in nature in that it is directed at treatment, as opposed to a criminal proceeding that results in punishment. Moreover, although many constitutional protections relating to criminal trials are available in extension proceedings, they are not all mandatory. For example, the prohibition against ex post facto application of the law, the privilege against self-incrimination (which we discuss further below), and the protection against double jeopardy have been found inapplicable in the NGI recommitment context. (*Id.* at pp. 1157-1158.)

1      Like the appellate court in *Otis*, the *Powell* court pointed out that the Legislature, in enacting section 1026.5, "did not say that the jury waiver

2  must be 'personally' made by the NGI committee." (*Powell*, *supra*, 114 Cal.App.4th 1153, 1159.) The court advanced that common sense indicates

3  persons subject to recommitment under section 1026.5 will uniformly already have been adjudicated mentally ill to the point of being found not

4  guilty by reason of insanity. Under these circumstances, the tactical reason to seek or waive a jury trial should be left to trial counsel and personal

5  waiver by the client is not necessary despite the statute's stated constitutional guarantees. [FN4] (*Powell*, *supra*, at pp. 1158-1159; accord,

6  *Givan*, *supra*, 156 Cal.App.4th 405, 410; see *Haynie*, *supra*, 116 Cal.App.4th 1224, 1229-1230 [NGI committee should not be able to "veto"

7  the tactical decision of counsel].) [FN5]

8          FN4. Contrary to defendant's contention, *Powell* did not hold that section 1026.5, subdivision (b)(7), does not incorporate the right to a

9      jury trial found in article I, section 16: "We do not deny the right to jury trial for such a person. We only limit the manner in which it may

10     be invoked or waived." (*Powell*, *supra*, 114 Cal.App.4th 1153, 1158.)

11

12          FN5. Even the *Haynie* opinion, upon which defendant heavily relies in challenging his being compelled to testify in the People's case,

13     cites to *Powell*, favorably. (See *Haynie*, *supra*, 116 Cal.App.4th 1224, 1229-1230.)

14      We next note that in *Givan*, *supra*, 156 Cal.App.4th 405, the defendant claimed the waiver of his jury trial in an NGI extension

15  proceeding was invalid because there was no evidence in the record of his knowledge of the right or waiver. (*Id.* at p. 410.) The *Givan* court, citing

16  *Powell*, affirmed that defense counsel can waive a defendant's right to a jury. (*Givan*, *supra*, at pp. 410-411.) The extension hearing was in Fresno,

17  but the defendant was in Napa State Hospital facing a court proceeding in Napa County. The defendant and his Napa attorney had instructed his

18  counsel in Fresno to obviate the need for him to personally appear because the defendant did not want to miss court dates in Napa. The Fresno attorney

19  so advised the court, and the matter proceeded as a court trial without defendant's presence. Under the circumstances, the court found that by

20  proceeding with a court trial in the defendant's absence implicitly waived the jury trial. [FN6] (*Id.* at p. 411.)

21

22          FN6. *Givan* further supports our conclusion, stated above, that the trial court's failure here to initially advise defendant of his right to a

23     jury does not require his commitment order to be set aside.

24      We also rejected defendant's suggestion that section 1026.5, subdivision (b)(3) and (b)(4), require us to reach a different result. As

25  noted above, section 1026.5, subdivision (b)(3), states that "The court shall advise *the person named in the petition* of the right to be represented by an

26  attorney and of the right to a jury trial." (Italics added.) We agree the statute requires trial courts to advise defendants of their right to a jury trial.

27  It does not follow that this right cannot be waived by a defendant's attorney. Similarly, section 1026.5, subdivision (b)(4), states, in part: "The trial shall

28  be by jury unless waived by both *the person* and the prosecuting attorney."

(Italics added.)  Again, per the authorities cited above, defendant's attorney, acting on defendant's behalf, properly waived jury trial. [FN7]

> FN7. We also disagree with defendant's contention that his case is "readily distinguishable" from *Powell* and *Givan*. The specific factual circumstances surrounding the defendants in those two cases were not essential to the appellate courts' conclusion that a defendant's attorney has the authority to waive the right to jury trial in NGI recommitment proceedings.

### B. No Violation of Defendant's Right to Due Process

We also disagree with defendant's argument that the trial court's conduct violated his due process rights. As the *Givan* court noted: "The right to trial by jury at a civil extension hearing is statutory, not constitutional." (*Givan, supra*, 156 Cal.App.4th 405, 410.) And the court in *Powell* disposed of the argument thusly: "Because the jury does not impose criminal punishment and has no power to determine the extent to which the person will be deprived of his or her liberty, a waiver of jury trial through counsel does not violate the person's constitutional right to jury trial. [Citations.] We reject the argument that the jury waiver was ineffective or violated appellant's due process rights." (*Powell, supra*, 114 Cal.App.4th 1153, 1159.)

In the recent opinion in *People v. Barrett* (2012) 54 Cal.4th 1081 (*Barrett*), our Supreme Court considered as similar issue. In that case, developmentally disabled adult had become the subject of a proceeding to civilly commit her as a "mentally retarded person" who is a "danger" to herself or others. (Welf. & Ins. Code, § 6500.) (*Barrett, supra*, at p. 1088.) Following a nonjury trial in which the committee was represented by counsel, the trial court sustained the allegations of the petition and she was committed for one year to the State Department of Development Services. (*Id.* at pp. 1088-1089.)

Unlike the NGI commitment provisions at issue in the instant case, the statutory scheme in *Barrett* does not expressly provide either for a right to jury trial, or for any related requirement that an alleged mentally retarded person be advised of, or allowed to personally act upon, any such right. However, the parties had agreed that she "was entitled under long-standing equal protection principles to a jury unless a jury was validly waived." (*Barrett, supra*, 54 Cal.4th 1081, 1089.) The committee claimed the trial court was constitutionally compelled to expressly advise her that she request a jury and to obtain her personal waiver of a jury, before holding a bench trial and deciding all commitment issues itself. The Supreme Court disagreed, finding no constitutional violation: "To encumber the jury trial right with a collateral requirement that any waiver be personally made by the proposed committee following a formal court advisement would serve no useful purpose in this context. This approach does not undermine the fairness of the proceedings in a due process sense, or treat dangerous mentally retarded persons differently from those with whom they are aligned for equal protection purposes." (*Ibid.*)

The *Barrett* court relied, in part, on its earlier decision in Masterson, a case involving mental competency proceedings: "*Masterson* first emphasized that in all cases, civil and criminal, "'a party's attorney has

general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters"....' Counsel, not the client, "'is captain of the ship."' [FN8] (*Masterson, supra,* Cal.4th 965, 969.)" (*Barrett, supra,* 54 Cal.4th 1081, 1101.) Noting that a criminal defendant does have a constitutional right to a jury trial that can only be "expressly and personally waived," the *Barrett* court explained that "a mental competence proceeding, though a byproduct of the underlying criminal prosecution, is not itself a criminal action in which the state constitutional requirement of an express personal waiver applies. Nor is it a civil action. It is a "'a special proceeding"' in which the right to trial by jury is *wholly statutory.* [Citations.]" (*Ibid.,* italics added.) The court noted that "*Masterson* then made the following key point: 'The sole purpose of a competency proceeding is to determine the defendant's present mental competence, i.e., whether defendant is able to understand the nature of the criminal proceedings and to assist counsel in a rational manner. [Citations.] Because of this, the defendant necessarily plays a lesser role in the proceeding than in a trial of guilt. *How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?'* (*Masterson, supra,* 8 Cal.4th 965, 971.)" [FN9] (*Ibid.,* italics added.) The *Barrett* court concluded "no fundamental interest requires us to hold that the nonjury trial in this case violated Barrett's due process right insofar as the record does not show that she personally declined a jury or was told of the right to request one." (*Id.* at p. 1105.)

FN8. Even defendant concedes the likelihood that an NGI defendant will act against his or her own best interest if allowed to override the decision of counsel: "It may very well be the case that empanelling a jury is a bad strategic move for an individual facing recommitment; but, if the law is to treat people as responsible individuals, giving them the dignity to make their own choices and to take responsibility for those choices – even bad choices – then the law must provide the appropriate procedural mechanisms to honor those choices." *People v. Ramirez* (1979) 25 Cal.3d 260, cited in support of this argument, is manifestly distinguishable as that case concerned the procedural due process that must be afforded before an inmate can be excluded from the California Rehabilitation Center.  Thus, the case did not concern the mental competency of a defendant.

FN9. Defendant asserts that "[t]o assume, before hand, that the individual facing a recommitment hearing is already 'insane' who cannot be trusted to make an informed decision about a jury has no relationship to honest conceptions of due process and begs the question [*sic*] as to why there should be a proceeding at all, if the person to be adjudged insane is already treated as insane."  While this argument has some appeal, in the present context it is simply not persuasive, particularly consider that defendant has maintained his NGI status since 1982.

Even if the trial court erred, we would find the error harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Counsel's decision to proceed with a court trial implicitly reflects a tactical decision that defendant's chances of avoiding an extension were better if the matter were tried to the court and not to a jury.  Given the evidence we have summarized above supporting his recommitment, we do not find it

1      reasonably probable defendant would have obtained a more favorable
2      outcome had the issues of dangerousness and difficulty in controlling his
      behavior been decided by a jury. (*Ibid.*)

3 (RT at 8-14.)

4      To the extent that Petitioner is claiming that the state courts misapplied state law

5 with respect to recommitment proceedings, such a claim is no basis for relief in this

6 Court. The Supreme Court has repeatedly held that federal habeas writ is unavailable for

7 violations of state law or for alleged error in the interpretation or application of state law.

8 *See Swarthout v. Cooke*, 131 S. Ct. 859, 861-62 (2011); *Estelle v. McGuire*, 502 U.S. 62,

9 67-68 (1991); *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Peltier v. Wright*, 15 F.3d 860,

10 861-62 (9th Cir. 1994); *see, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir. 2006)

11 (claim that state supreme court misapplied state law or departed from its earlier decisions

12 does not provide a ground for habeas relief).

13      Based on a review of the record and the applicable law, the Court finds that

14 Petitioner ultimately fails to state a claim meriting habeas relief. The Sixth Amendment

15 right to jury trial only attaches to criminal trials. *See Chatman v. Marquez*, 754 F.2d

16 1531, 1534 (9th Cir.), *cert. denied*, 474 U.S. 841 (1985). The hearing at issue here was a

17 recommitment hearing, a civil matter, and therefore it cannot be said that Petitioner had a

18 Sixth Amendment right to a jury trial. *See Budell*, 187 F.3d at 1141. Furthermore,

19 Petitioner does not claim that any of the procedural safeguards under *Vitek*, 445 U.S. at

20 494-96, were lacking at the hearing at issue. Rather, *Vitek* only requires "an independent

21 decision-maker," and does not specify that it be a jury rather than a judge. *Id.*

22 Accordingly, in the absence of clearly established Supreme Court law to the contrary, it

23 cannot be said that the state court's rejection of Petitioner's right to jury trial claim was an

24 objectively unreasonable application of Supreme Court precedent. 28 U.S.C. §

25 2254(d)(1).

26      Neither can it be said that the state court's denial resulted in a decision that was

27 based on an unreasonable determination of the facts in light of the evidence presented in

28 the state court proceeding. 28 U.S.C. § 2254(d)(2). The state appellate court reviewed

1   Dr. Schirmer's testimony which included a six-page report regarding Petitioner's
2   recommitment. In preparing the report, Dr. Schirmer reviewed three volumes of material
3   on Petitioner, including his chart, nursing notes, physician's notes and his legal record.
4   The diagnosis was that Petitioner is schizophrenia paranoid type, with a history of
5   prominent delusions which impairs his sleep. This lack of sleep was one of the
6   contributing factors for Petitioner's attack on Corona, the underlying offense. Petitioner
7   was currently on daily medication for his schizophrenia. Dr. Schirmer's opinion was that
8   Petitioner would not take his medication if released to the community, which was not an
9   unreasonable conclusion since Petitioner stopped taking his medication the last time he
10  was released on CONREP. Petitioner had made no progress in understanding his illness
11  and lacked insight into his symptoms and condition, which made it even more likely that
12  he would stop taking his medication since he did not believe his illness requires them.
13  Without the medication, Petitioner would become more symptomatic and delusional,
14  which has led to violence in the past. Therefore, Dr. Schirmer opined that Petitioner
15  would pose a substantial risk of danger to others if he was not in a hospital setting. *See*
16  *supra* at 2-3.

17      The state court also considered Petitioner's testimony at trial. His testimony
18  confirmed Dr. Schirmer's concerns, that Petitioner did not completely understand his
19  condition and that Petitioner would stop taking his medication. Petitioner testified that he
20  did not believe the medication was essential to keep him from becoming psychotic or
21  committing crimes. Petitioner felt so strongly that he would be willing to take legal
22  action to try to get off of the medication. *See supra* at 4-5.

23      Based on the evidence presented at trial, *i.e.*, the testimonies of Dr. Schirmer and
24  Petitioner, the state appellate court reasonably concluded that Petitioner would pose a
25  substantial danger to himself and to others if he was not recommitted. Nor was it was
26  unreasonable for the state court to conclude, based on the evidence, that Petitioner would
27  not have obtained a more favorable outcome had the issues of his behavior been decided

28

1  by a jury. *See supra* at 15. Accordingly, Petitioner is not entitled to habeas relief on this

2  claim.

3      2.   **Right Against Self-Incrimination**

4      Petitioner claims that the trial court erred by forcing him to testify against himself.

5  The state appellate court found no error:

> Defendant next claims that the extended-commitment order must be
> set aside because he has made to testify against himself. As he notes,
> California appellate courts have split on whether a defendant can be
> compelled to testify as a part of the prosecution's case in NGI
> recommitment proceedings.

> In criminal proceedings, the constitutional privilege against self-
> incrimination affords a defendant the absolute right not to testify. (*People
> v. Lopez* (2006) 137 Cal.App.4th 1099, 1106 (*Lopez*).) In contrast, a person
> who is the subject of a civil commitment proceedings may – as in all civil
> proceedings – assert that privilege against self-incrimination only by
> refusing to answer criminally incriminating questions. (*Id.* at pp. 1106-
> 1107.) The person does not otherwise have the constitutional right to refuse
> to testify at the commitment proceedings. (*Ibid.*) Our Supreme Court stated
> in *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137-138 (*Cramer*), that "the
> historic purpose of the privilege against being called as a witness has been
> to assure that the *criminal* justice system remains accusatorial, not
> inquisitorial. [Citations.] The extension of the privilege to an area outside
> the criminal justice system, in our view, would contravene both the
> language and purpose of the privilege." [FN10] However, this general rule
> does not preclude the Legislature from creating a statutory right not to
> testify at civil commitment proceedings.

> FN10. See also *Allen v. Illinois* (1986) 478 U.S. 364, 374-375
> (defendant has no federal constitutional right to refuse to testify at a
> civil commitment proceeding.)

> If defendant had a right to refuse to testify, that right emanates from
> section 1026.5, subdivision (b)(7), which, again, entitles a defendant to the
> rights guaranteed under the federal and state Constitutions for criminal
> proceedings. Thus, the question becomes: Has the Legislature afforded the
> right to refuse to testify at civil commitment proceedings by statute?
> Defendant argues that it has.

> This same issue was first addressed by the Fifth Appellate District in
> 2004 in *Haynie, supra,* 116 Cal.App.4th 1224. Based on the plain language
> of section 1026.5, subdivision (b)(7), the appellate court in *Haynie* conclude
> "the Legislature's words clearly and unambiguously state the person 'is
> entitled to the rights guaranteed under the federal and State Constitutions
> for criminal proceedings.' A defendant in a criminal matter has an absolute
> right not to be called as a witness and not to testify. [Citations.] Under the
> plain language of the statute, because [the defendant] is entitled to the same
> rights guaranteed to a criminal defendant, he should not have been
> compelled to testify in the prosecution's case at his commitment extension
> trial." (*Haynie, supra,* at p. 1228.)

1       The *Haynie* court explained: "The right to not be compelled to testify against oneself is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating. By calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case. We have no doubt that a committee so compelled to testify is prejudiced under these circumstances. The California Supreme Court noted in [*Cramer*] that permitting the jury to observe the person sought to be committed and to hear him speak and respond provided 'the most reliable proof and probative indicator of the person's mental condition.' [Citation.] As such, we cannot conclude that compelling [the defendant] to testify, even if his testimony was in some regards cumulative to that of other witnesses, was harmless error." (*Haynie*, 116 Cal.App.4th 1224, 1230.)

    The *Haynie* court distinguished the earlier case of *People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3rd 477, 488 (*Williams*), in which the appellate court held that double jeopardy prohibitions do not apply in section 1026.5 proceedings, either by constitutional mandate or by virtue of the language of the statute itself. The *Haynie* court agreed with *Williams* insofar as the earlier case held the statutory language of section 1026.5 does not extend the "'protections of constitutional provisions which bear no relevant relationship to the proceedings.'" (*Haynie, supra*, 116 Cal.App.4th 1224, 1229.) In particularly, it found the *Williams* court had reasonably determined that double jeopardy principles "did not prevent the People from petitioning for a writ of mandate to determine whether the trial court erred as a matter of law when it nonsuited their action for a commitment extension under section 1026.5." (*Haynie, supra*, at p. 1229.) Thus, the *Haynie* court limited the holding in *Williams* to its facts.

    The court in *Haynie* also disagreed with the *Powell* court's statement that the statutory language in section 1026.5, subdivision (b)(7) "'merely codifies the application of constitutional protections to extension hearings mandated by judicial decision.'" (*Haynie, supra*, 116 Cal.App.4th 1224, 1230.) On that point, the *Haynie* court opined that such a view would render the statutory provision "surplusage" and, in essence, supplant the statutory language by authorizing courts to decide what constitutional rights applied. (*Id.* at p. 1230.) In addition, the *Haynie* court noted that *Williams* and *Powell* did not involve the privilege against self-incrimination. It concluded that even if those two cases were correct in holding, respectively, that section 1026.5, subdivision (b)(7), did not guarantee the protection against double jeopardy and the requirement of a personal jury trial waiver, the statute did guarantee the privilege against self-incrimination, because that privilege is clearly and relevantly implicated in an NGI commitment proceeding. (*Haynie, supra*, at pp. 1228-1230.)

    Soon after it issued the *Haynie* opinion, the Fifth District Court of Appeal considered a minor's right to decline to testify pursuant to Welfare and Institutions Code section 1801.5, which pertains to civil commitment or recommitment trials. (*In re Luis C.* (2004) 116 Cal.App.4th 1397, 1399 (*Luis C.*).) That statute provides, in relevant part: "The [minor] shall be entitled to *all* rights guaranteed under the federal and state constitutions in criminal proceedings." (Welf. & Inst. Code, § 1801.5, italics added.) [FN11] Specifically, the appellate court was asked whether the trial court violate the minor's Fifth Amendment rights when it refused to instruct the

jury that he had a right not to testify and no inference could be drawn from the fact that he did not. (*Luis C.*, *supra*, at p. 1399.) Adopting the *Haynie* court's reasoning, the *Luis C.* court held that the trial court erred in refusing to instruct the jury as requested. (*Luis C.*, *supra*, at p. 1403.)

> FN11. Because of the difference in the language of section 1026.5, subdivision (b)(7), as compared to Welfare and Institutions Code section 1801.5, we are not inclined to find *Luis C.* to be persuasive as to whether the former statute includes a right to refuse to testify in an NGI recommitment proceeding.

Subsequently, in *Lopez*, Division Two of the Fourth District Court of Appeal disagreed with *Haynie* and concluded the Legislature did not intend to give the right not to testify to persons subject to commitment. (*Lopez*, *supra*, 137 Cal.App.4th 1099, 1116.) In *Lopez*, the subject of an MDO commitment proceeding argued that equal principles required him to be afforded the same rights as NGI committees possess, including the right to refuse to testify per *Haynie*, The court in *Lopez* disagreed, criticizing the *Haynie* court for having overlooked *People v. Henderson* (1981) 117 Cal.App.3d 740 (*Henderson*): "*Haynie* did not... discuss the fact that another previous decision that *did* involve the privilege against self-incrimination had held that *identical language* to that set forth in Penal Code section 1026.5(b)(7) *did not* extend the privilege to a civil committee. [*Henderson*] was a proceeding to extend the defendant's commitment to the Department of Mental Health under the former law governing civil commitment of mentally disordered sex offenders [citations]. The defendant argued, in part, that he was entitled to the privilege against self-incrimination under Welfare and Institutions Code former section 6316.2, subdivision (e), which provided: 'The patient shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees.' As can be seen, except for the use of 'patient' instead of 'person,' that language is identical to that of Penal Code section 1026.5(b)(7)." (*Lopez*, *supra*, at pp. 1110-1111.)

The *Lopez* court further stated: "Notwithstanding the statutory language, *Henderson* concluded: 'Subdivision (e) of [Welfare and Institutions Code former] section 6316.2 codifies the application of constitutional protections to MDSO proceedings mandated by judicial decision [citations]. It does not extend the protection of the constitutional privileges against self-incrimination to testimonial communications which are not incriminatory.' [Citation.] In other words, an MDSO committee was entitled to the ordinary privilege applicable to civil proceedings, which protects only incriminating communications, but not to the broader privilege afforded a criminal defendant." [FN12] (*Lopez*, *supra*, 137 Cal.App.4th 1099, 1111.) The *Lopez* court noted that the "*Haynie* court's only mention of *Henderson* was to note that the court in that case 'held that the admission at trial of Henderson's statements to hospital staff made in the course of routine therapy sessions that he was sexually stimulated by violence did not violate his privilege against self-incrimination.' [Citation.] The court did not discuss the fact that *Henderson* had concluded identical language to that found in section 1026.5(b)(7) did not grant a committee the self-incrimination privilege enjoyed by a criminal defendant." (*Ibid.*) The *Lopez* court rejected the holdings in *Haynie* and *Luis C.*, concluding that the statutory schemes did not provide civil committees the right not to testify,

and therefore the defendant did not experience any disparate treatment when the court admitted his prior testimony into evidence. (*Lopez, supra*, at p. 1116.)

> FN12. Specifically, the *Henderson* court had concluded that this language only "codifies the application of constitutional protections to MDSO proceedings mandated by judicial decision [citations]. It does not extend the protection of the constitutional privilege against self-incrimination to testimonial communications which are not incriminatory." (*Henderson, supra*, 117 Cal.App.3d 740, 748.)

In *Cramer, supra*, 23 Cal.3d 131, our Supreme Court reasoned that as a matter of common sense the jury should be allowed to hear the potential civil committee's testimony to the extent it is not criminally incriminatory. (*Id.* at p. 139.) The court explained: "[W]hile appellant could not be questioned about matters that would tend to incriminate him, he was subject to call as a witness and could be required to respond to nonincriminatory questioning which my have revealed his mental condition to the jury, whose duty it was to determine whether he was mentally retarded. Reason and common sense suggest that it is appropriate under such circumstances that a jury be permitted fully to observe the person sought to be committed, and to hear him speak and respond in order that it may make an informed judgment as to the level of his mental and intellectual functioning. The receipt of such evidence may be analogized to the disclosure of physical as opposed to testimonial evidence and may in fact be the most reliable proof and probative indicator of the person's present mental condition." (*Ibid.*)

As reflected in *Cramer's* reasoning, at a civil commitment proceeding the fact finder's ability to determine whether a persons' mental disorder is sufficiently in remission to allow his or her safe release into society would be significantly impaired if they were not allowed to observe the person's demeanor and thought processes on the stand. [FN13] (See also *People v. Leonard* (2000) 78 Cal.App.4th 776, 793 [allowing the People to question the civil committee "enhances the reliability of the outcome"].) Further, inquiry into a person's mental condition is not akin to inquiry into whether the person has committed a crime. The courts have repeatedly recognized that, subject to the person's right to refuse to answer criminally inculpatory questions, the People may properly question a civil committee about his or her mental condition without violating the privilege against self-incrimination. (See *Cramer, supra*, 23 Cal.3d 131, 137, 139; *People v. Clark* (2000) 82 Cal.App.4th 1072, 1081-1082; *People v. Leonard, supra*, at pp. 792-793; *People v. Merfeld* (1997) 57 Cal.App.4th 1440, 1446-1447.)

> FN13. Defendant relies heavily on *Addington v. Texas* (1979) 441 U.S. 418, in arguing that the People should not be permitted to force potential committees to testify. The case is inapposite in that it addressed the standard of proof for civil commitment proceedings only: "To meet due process demands, the standard has to inform the factfinder that the proof must be greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases." (*Addington, supra*, at pp. 432-433.)

We conclude that because application of the absolute right not to testify at a civil commitment proceeding would undermine the fact finder's

proper performance of its duty to evaluate the person's mental condition, and because the People's inquiry regarding mental condition does not pertain to criminal culpability, the absolute right not to testify has no meaningful application at civil commitment proceedings. [FN14] Accordingly, this right should not be included among the unspecified rights the Legislature has generally extended to civil committees in the various civil commitment statutes.

> FN14. Here, defendant does not allege that any questions asked of him implicated his Fifth Amendment right against self-incrimination.

Alternatively, we conclude that even if a statutory right not to testify applies to civil commitment trials, the admission of defendant's testimony was harmless under any standard of review. (See *Cramer, supra*, 23 Cal.3d 131, 139 [applying harmless beyond a reasonable doubt standard to erroneous deprivation of civil committee's right to refuse to answer criminal incriminating questions].) Even without defendant's testimony, Schirmer's testimony provided persuasive evidence that defendant meets the requirements for an extension of his NGI commitment. His testimony established that defendant suffers from a severe mental illness into which he lacks any meaningful insight, and that, away from a hospital setting, there is a substantial likelihood he would refuse medication and engage in behaviors that would likely escalate into violence if he was released into the community.

(Op. at 15-21.)

As the state appellate court correctly noted, *see supra* at 17, a defendant has no federal constitutional right to refuse to testify at a civil commitment proceeding. *See Allen v. Illinois* (1986) 478 U.S. 364, 374-375.  Furthermore, as is the case with Petitioner's first claim, *see supra* at 15, the fact that state law may have provided statutory protections which the trial court allegedly violated is not grounds for federal habeas relief in this Court. *See Swarthout*, 131 S. Ct. at 861-62.  This Court is bound by the state appellate court's conclusion based on its extensive review of the holdings in *Haynie, Lopez, Henderson*, and *Cramer*, that the right against self-incrimination should not be included among the unspecified statutory rights which the state legislature has generally extended to civil committees. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).[4]  Accordingly, in the absence of clearly established

---

[4]Nor are there any grounds for re-examining the state appellate court's interpretation because it does not appear to be an obvious subterfuge to evade consideration of a federal issue *See Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11 (1975);

1    Supreme Court law to the contrary, it cannot be said that the state court's rejection of

2    Petitioner's right against self-incrimination claim was an objectively unreasonable

3    application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

4           The Court also concludes that the state court's denial did not result in a decision

5    that was based on an unreasonable determination of the facts in light of the evidence

6    presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). As discussed by the

7    state appellate court, there was sufficient evidence based on Dr. Schirmer's testimony and

8    report by which a jury could reasonably conclude that Petitioner continued to suffer from

9    a severe mental illness which, without medication, would likely cause him to engage in

10   violent behavior if released into the community. *See supra* at 21. The fact that Dr.

11   Schirmer believed that Petitioner was likely to stop taking his medication based on past

12   behavior and Petitioner's persistent lack of insight into his mental illness was sufficient

13   evidence by which a jury could conclude that Petitioner should remain in a hospital

14   setting for his own safety and that of others. *Id.* at 3-4. Accordingly, Petitioner is not

15   entitled to habeas relief on this claim.

16          3.    **Due Process**

17          Petitioner's final claim is that the state courts denied him due process by failing to

18   abide by state statutory procedures as required by *Hicks v. Oklahoma*, 447 U.S. 343

19   (1980). (Pet. at 6.). The Court notes that Petitioner's reliance on *Hicks* is misplaced as

20   that case has to do with sentencing matters in a criminal case, *id.* at 346 (finding that

21   defendant may not be arbitrarily denied state-created liberty interest in sentencing

22   procedure), and therefore completely irrelevant to the challenged civil commitment

23   proceeding at issue. Furthermore, Petitioner makes no specific factual allegations in his

24   petition or explains in his traverse how the state court's alleged failure to abide by its own

25   laws constitutes a federal claim. As discussed several times above, federal habeas writ is

26   unavailable for violations of state law or for alleged error in the interpretation or

27

28

*see Little v. Crawford*, 449 F.3d at 1083.

1    application of state law.  *See supra* at 15, 21.  Accordingly, it cannot be said that the state

2    court's rejection of this claim was contrary to, or involved an unreasonable application of,

3    clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).  Petitioner is not

4    entitled to habeas relief on this claim.

5

6                                **CONCLUSION**

7         For the reasons set forth above, the petition for writ of habeas corpus is **DENIED**.

8         The federal rules governing habeas cases brought by state prisoners require a

9    district court that denies a habeas petition to grant or deny a certificate of appealability

10    ("COA") in its ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

11    2254.  Petitioner has not shown "that jurists of reason would find it debatable whether the

12    petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*,

13    529 U.S. 473, 484 (2000).  Accordingly, a COA is **DENIED**.

14         The Clerk shall close the file.

15         **IT IS SO ORDERED.**

16

17    DATED: 1-2-2015

18                                     BETH LABSON FREEMAN
                                       United States District Judge

19

20

21

22

23

24

25

26

27

28